1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RICHARD RAMIREZ,                         No.  2:17-cv-00619 TLN KJN

12                   Petitioner,

13          v.                                 FINDINGS & RECOMMENDATIONS

14    CHRISTIAN PFEIFFER, Warden,

15                   Respondent.

16

17    I.  Introduction

18          Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2011 convictions for

20    second degree murder with use of a firearm and being a felon in possession of a firearm.

21    Petitioner was sentenced to forty years-to-life in state prison.  Petitioner claims that (1) his second

22    degree murder conviction is not supported by sufficient evidence, (2) the prosecutor engaged in

23    prejudicial misconduct concerning the definition of voluntary manslaughter, (3) the prosecutor's

24    closing argument was improper and trial counsel was ineffective for failing to object, (4) the trial

25    court erred in refusing to instruct on defense of others, (5) the trial court erred by instructing the

26    jury with CALCRIM 3472, (6) the cumulative effect of the errors petitioner alleges in grounds

27    two through five resulted in an unfair trial, and (7) the imposition of the personal use of a firearm

28    enhancement at sentencing violates the Eighth Amendment prohibition against cruel and unusual

                                              1

punishment.  After careful review of the record, this court concludes that the petition should be denied.

II.  Procedural History

On July 19, 2011, a jury found petitioner guilty of second degree murder (Cal. Pen. Code, §§ 187/189) and found true a firearm use enhancement (Cal. Pen. Code, 12022.53(d)); it also found petitioner guilty of being a felon in possession of a firearm (Cal. Pen. Code, § 12021(a)(1)). (LD 2 322-24, 389-90; LD 6 at 833-37.)[1]  On November 4, 2011, petitioner was sentenced to forty years-to-life in state prison.  (LD 2 at 433-34; LD 3 at 22-23; LD 6 at 841-55.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  The Court of Appeal affirmed the conviction on October 25, 2016.  (LD 12.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on January 25, 2017.  (LD 13 & 14.)

Petitioner filed the instant petition on March 23, 2017.  (ECF No. 1.)

III.  Facts[2]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

**Prosecution Evidence**

On the afternoon of May 24, 2009, Monica Cassas hosted a birthday party for her nephew Jeremiah Uribe. At least 30 guests—including defendant—attended the party at Cassas's house on 18th Avenue in Sacramento. Defendant was known to the group as "Boxer" or "Box."

While the party was going on, Christopher Montejano arrived. Montejano, known as "Criminal," was angry and looking to fight

---

[1] "LD," followed by the appropriate numerical reference, refers to the documents lodged with this court on August 28, 2017, by respondent, comprising the state court record.  "ECF" refers to this court's electronic case management filing system; the docket and page numbers associated with these citations refer to those automatically generated by the court's electronic filing system.

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Ramirez, No. C069700, dated October 25, 2016, a copy of which was appended to respondent's answer as an exhibit and lodged by respondent as LD 12.

defendant. Montejano called for defendant to come outside, but a few men at the party told Montejano there were children present and it was "not the time or the place" for a fight. Montejano got into a car and left.

Montejano returned and repeated his call for defendant to come outside to fight. Again, some men at the party told Montejano to resolve it at a later time, "old school style" with a fistfight. At some point, in the backyard, Daniel Uribe handed defendant a gun. Montejano left again.

Montejano returned a [third] time. This time he was wearing a child-size backpack. Montejano appeared to be "really aggravated" and was screaming. One of the party attendees, Marissa Almanza, was outside and observed Montejano pacing back and forth in front of the house, saying, "I will just ... shoot you bitches and kids. I don't care." Montejano, however, did not display a gun, and eventually Almanza went inside the house. Defendant came outside and told Montejano, "You want to talk, let's talk."

Defendant and Montejano walked together to a driveway approximately four houses from the birthday party. Several witnesses saw defendant and Montejano argue loudly. Michelle Griffin heard Montejano exclaim, "[G]o ahead shoot me, if you're gonna shoot me, shoot me." The men argued for 10 minutes, during which Montejano began to "try to unzip his backpack." However, he "never got a chance to" do so because defendant pulled a gun out of his pants pocket and shot Montejano. Almanza looked over when she heard shots. She saw Montejano lying on his side in a fetal position, and then heard four more shots.

Defendant took the backpack off of Montejano and ran away. Eddie Sabala was able to see inside the backpack, which was unzipped. Inside, he saw a semi-automatic handgun.

A white Cadillac pulled up in front of where Montejano lay, and its occupants dragged his limp body into the car and drove Montejano to the University of California, Davis Medical Center's emergency room. Montejano received several operations in an attempt to repair the damage caused by six gunshot wounds. Five days after the shooting, Montejano died due to gunshot wounds and the secondary effects of shock and pneumonia.

Three weeks after the shooting, defendant was arrested in Russellville, Arkansas. Arkansas State Police Officer Chris Goodman was on patrol when he observed a black sport-utility vehicle "jerked from the right lane to the left" in a way that "cut off" the car in front of the patrol vehicle. Officer Goodman initiated a traffic stop, looked at the three occupants of the vehicle, and recognized defendant from a photograph in a bulletin issued by the United States Marshall's office. When the officer told defendant he was wanted for murder, defendant answered that his name was Jose Manuel. After he was handcuffed and placed in Officer Goodman's vehicle, defendant said: "You got me. I'm Richard Ramirez."

3

1    Defense Evidence

2    The defense presented evidence that Angella Sandoval, Montejano's
     former girlfriend and mother of his child, got into a fight with Monica
3    Cassas about a week before the shooting. The two women ended up
     hitting and pulling each other's hair. Defendant intervened by pulling
4    Sandoval away by her hair. Sandoval retorted that she was going to
     tell Montejano about the incident. Defendant responded, "[F]uck
5    you. Get out of my face." Although Sandoval did not inform
     Montejano, he nonetheless learned about the incident "[b]y word of
6    mouth."

7    During the party, defendant told Almanza he would later box with
     Montejano at a park and that would "handle" the situation.
8
     During a June 14, 2011, interview with Detective Derrick
9    Greenwood, Sabala stated Montejano "was trying to, like reach and
     grab his gun, it was zipped up [inside the backpack], and, um,
10   [defendant] pulled out his gun and shot him." However, Sabala also
     stated he saw the gun in the backpack only after defendant took it
11   from Montejano as he lay on the ground.

12

13   (People v. Ramirez, slip op. at 2-3.)

14   IV.  Standards for a Writ of Habeas Corpus

15       An application for a writ of habeas corpus by a person in custody under a judgment of a

16   state court can be granted only for violations of the Constitution or laws of the United States.  28

17   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

18   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

19   U.S. 62, 67-68 (1991).

20       Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

21   corpus relief:

22       An application for a writ of habeas corpus on behalf of a person in
         custody pursuant to the judgment of a State court shall not be granted
23       with respect to any claim that was adjudicated on the merits in State
         court proceedings unless the adjudication of the claim -
24
             (1) resulted in a decision that was contrary to, or involved an
25       unreasonable application of, clearly established Federal law, as
         determined by the Supreme Court of the United States; or
26
             (2) resulted in a decision that was based on an unreasonable
27       determination of the facts in light of the evidence presented in the
         State court proceeding.
28

                                             4

1    28 U.S.C. § 2254(d).

2           For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

3    holdings of the United States Supreme Court at the time of the last reasoned state court decision.

4    Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct.

5    38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v.

6    Taylor, 529 U.S. 362, 412 (2000)).  Circuit court precedent "may be persuasive in determining

7    what law is clearly established and whether a state court applied that law unreasonably."  Stanley,

8    633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

9    precedent may not be "used to refine or sharpen a general principle of Supreme Court

10   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall

11   v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per

12   curiam)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted

13   among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as

14   correct.  Id.  Further, where courts of appeals have diverged in their treatment of an issue, it

15   cannot be said that there is "clearly established Federal law" governing that issue.  Carey v.

16   Musladin, 549 U.S. 70, 77 (2006).

17          A state court decision is "contrary to" clearly established federal law if it applies a rule

18   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

19   precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).

20   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

21   writ if the state court identifies the correct governing legal principle from the Supreme Court's

22   decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3]  Lockyer v.

23   Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d

24   997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply

25   because that court concludes in its independent judgment that the relevant state-court decision

26   ───────────────

27   [3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
28   384 F.3d 628, 638 (9th Cir. 2004)).

applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Williams v. Taylor</u>, 529 U.S. at 411. <u>See also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Lockyer</u>, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." <u>Richter</u>, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99-100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803

6

(1991)).  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.  This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Id. at 101.  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V.  Petitioner's Claims

        Ground One: *Sufficiency of the Evidence*

        Petitioner claims that his conviction for second degree murder is not supported by substantial evidence because "[t]he uncontroverted evidence presented … demonstrated that the victim … was shot in an act of imperfect self-defense or as the result of a 'sudden quarrel or heat of passion.'"  As a result, petitioner asserts his constitutional rights to due process have been violated.  (ECF No. 1 at 6-11.)  Respondent maintains the state court's determination was reasonable and that relief must be denied.  (ECF No. 15 at 25-35.)

        The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> **Sufficiency of the Evidence for Second Degree Murder**
>
> Defendant challenges his conviction for second degree murder on grounds the "evidence presented at trial, at most, showed that Christopher Montejano was killed in the heat of passion or in imperfect self-defense." He argues the insufficiency of the evidence for second degree murder requires his conviction to be reduced to voluntary manslaughter. We are not persuaded.
>
> **A.  Standard of Review**
>
> Ordinarily in reviewing a claim of evidentiary insufficiency, our "task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317–320, 61 L.Ed.2d 560.) The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two

8

interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]'" (*Id*. at pp. 792–793.)" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Defendant's argument, however, differs significantly from the usual insufficiency of the evidence claim. In contrast to most insufficiency of the evidence claims in which defendants claim a lack of solid, credible evidence in support of their convictions, the claim in this case is based on the jury's failure to accept additional evidence that would have reduced defendant's second degree murder conviction to voluntary manslaughter. In other words, defendant's argument does not attempt to undermine the evidentiary value of testimony upon which his conviction is founded but to cast evidence not relied upon as so persuasive and uncontradicted the jury was required to accept it. In effect, defendant asks us to consider the evidentiary value of the testimony regarding circumstances that might have amounted to heat of passion or imperfect self-defense to conclude no jury could have failed to accept the evidence.

On this point, we find instructive the California Supreme Court's decision in *Jackson v. Superior Court* (1965) 62 Cal.2d 521, 529 (*Jackson*). In *Jackson*, the Supreme Court noted there might be a case in which evidence of heat of passion or self-defense is uncontradicted and subject to only one interpretation so that it precludes a murder conviction. (*Id*. at p. 528.) *Jackson* involved a petition for a writ to prevent the superior court from taking further action on an indictment for murder after a grand jury was presented with evidence the defendant shot the victim after the victim spent two hours denigrating the defendant's boyfriend and making sexually explicit suggestions. (*Id*. at pp. 524, 528.) Among other arguments presented to the Supreme Court, the defendant argued that "malice cannot be implied in this case because the evidence before the grand jury assertedly establishes as a matter of law either justifiable killing in self-defense or at least provocation adequate to reduce the crime to voluntary manslaughter." (*Id*. at p. 528.)

The *Jackson* court rejected the argument and explained: "As an abstract proposition, it is of course conceivable that a case of homicide could be presented to the grand jury in which evidence of adequate provocation or self-defense were both uncontradicted and sufficient as a matter of law; in that event it could reasonably be contended that an indictment for murder would be in excess of the grand jury's power. But this is not such a case. Here petitioner's

theory is that the killing was 'provoked by the decedent's persistent and clearly-demonstrated determination to commit a sexual assault' upon her, and she naturally emphasizes those aspects of the evidence which support her theory. That evidence, however, is neither uncontradicted nor susceptible of only one interpretation." (*Jackson, supra*, 62 Cal.2d at p. 528.) The evidence must be uncontradicted and susceptible of only one interpretation because, as an appellate court, we do not "resolve any such conflicts or questions of credibility ... for these issues are peculiarly within the province of the trier of fact." (*Id*. at p. 529.)

**B.   Second Degree Murder and Voluntary Manslaughter**

Murder is defined as "the unlawful killing of a human being or a fetus, with malice aforethought." (§ 187, subd. (a).) "'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.)'" (*People v. Sarun Chun* (2009) 45 Cal.4th 1172, 1181, quoting *People v. Hansen* (1994) 9 Cal.4th 300, 307.)

Second degree murder may be reduced to voluntary manslaughter with evidence that negates malice. "'"A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of ... voluntary manslaughter. (§ 192.)" (*People v. Barton* (1995) 12 Cal.4th 186, 199 (*Barton*).) Generally, the intent to unlawfully kill constitutes malice. (§ 188; *People v. Saille* (1991) 54 Cal.3d 1103, 1113; see *In re Christian S.* (1994) 7 Cal.4th 768, 778–780 (*Christian S.*).) "But a defendant who intentionally and unlawfully kills lacks malice ... in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense (see [*Christian S., supra*,] 7 Cal.4th 768; [*People v. Flannel* (1979) ] 25 Cal.3d 668." (*Barton, supra*, 12 Cal.4th at p. 199.) "'Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation].' ([*People v. Breverman* (1998) 19 Cal.4th 142,] 153–154.)" (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

In contrast to most elements of crimes, "'[n]either heat of passion nor imperfect self-defense is an element of voluntary manslaughter' that must be affirmatively proven. (*People v. Rios* (2000) 23 Cal.4th 450,

454.) Rather, they are 'theories of partial exculpation' that reduce murder to manslaughter by negating the element of malice. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016.)" (*Moye, supra*, 47 Cal.4th at p. 549.) Thus, "in a murder case, unless the People's own evidence suggests that the killing may have been provoked or in honest response to perceived danger, it is the defendant's obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his [or her] guilt of murder. (§ 189.5, subd. (a); *People v. Sedeno* (1974) 10 Cal.3d 703, 719 (*Sedeno*); *Jackson v. Superior Court* (1965) 62 Cal.2d 521, 526; *People v. Bushton* (1889) 80 Cal. 160, 164; see also *Barton, supra*, 12 Cal.4th 186, 199.) [¶] If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704, 44 L.Ed.2d 508), the People must prove beyond a reasonable doubt that these circumstances were lacking in order to establish the murder element of malice. (*Id*., at pp. 703–704; *People v. Bloyd* (1987) 43 Cal.3d 333, 349.)" (*People v. Rios* (2000) 23 Cal.4th 450, 461–462, fns. omitted.)

## C. Whether the Evidence Required a Voluntary Manslaughter Conviction

In arguing for a reduction of his conviction to voluntary manslaughter, defendant does not deny he engaged in an intentional homicide or that the evidence was sufficient to convict him of second degree murder. Instead, the gravamen of his argument is that the jury was required to accept additional evidence proving he committed only voluntary manslaughter on grounds of heat of passion and imperfect self-defense. As to this argument, we conclude the reasoning in *Jackson* applies in this case where the contention is that the trier of fact was required as a matter of law to accept evidence that would reduce murder to voluntary manslaughter. (62 Cal.2d at pp. 528–529) Applying *Jackson*'s guidance, we reject defendant's argument.

Here, two witnesses testified they watched defendant argue with Montejano, pull out a gun, and repeatedly shoot Montejano. "The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill. ...'" (*People v. Smith* (2005) 37 Cal.4th 733, 741, quoting *People v. Lashley* (1991) 1 Cal.App.4th 938, 945.) Thus, the evidence supported defendant's conviction of second degree murder. Defendant, however, seeks to negate this evidence of second degree murder by arguing the jury also was required to accept evidence showing defendant acted in the heat of passion and in imperfect self-defense. In support of his argument, he relies on the following statements of the trial court at sentencing:

"In my view where I sit and watch the evidence, it's a tragedy because I think it is, as [defense counsel] said, an event that could have been avoided by both young men. I think both of these young men made bad decisions, and I don't want to beat up on the Montejano family, but I think Christopher pushed things. He was angry. He came back not once, not twice, but three times. His nickname was 'Criminal.' So people knew about him. [Defendant] knew about him. He had a backpack. People could make assumptions about what was in the backpack."

The court further stated, "I do agree with the jury's verdict. I don't disagree at all. I think that ultimately what happened did occur. I think that [defendant] was fed up, and I'm not saying he wasn't provoked. He was by [Montejano] coming back repeatedly to the birthday party. It's clear that people were trying to cool him down, and he would not listen, referring to [Montejano], but it's also clear that [defendant] decided he had enough and armed himself ahead of time and then walked down the street and made the decision to kill and did kill."

The trial court elaborated, "I do think [defendant] committed the second degree murder that is imposed here. I do think he was provoked, and I think the jury took that into consideration and did not find him guilty of the first degree murder. [¶] So I agree with the ultimate resolution of the case."

Regardless of the trial court's statements at sentencing, the evidence relied upon by defendant in his appellate arguments to establish heat of passion and imperfect self-defense was not uncontradicted or susceptible of only one interpretation.

**1. Heat of Passion**

For purposes of voluntary manslaughter, a heat of passion defense " 'has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As [the California Supreme Court] explained long ago in interpreting the language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his [or her] own standard of conduct and justify or excuse himself [or herself] because in fact his [or her] passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].'" (*People v. Steele* [(2002)] 27 Cal.4th 1230, 1252–1253.)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216.)

12

Here, the trial court's comments regarding defendant being "provoked" by Montejano do not establish the jury was required to find the evidence showed defendant killed in heat of passion. Defendant did not testify. And the defense did not call any witnesses to show he was enraged when he confronted Montejano on the street. Instead, the evidence showed defendant invited Montejano to go down the street by saying, "[Y]ou want to talk, let's talk." After defendant and Montejano walked several houses away, the two began shouting at each other. None of the witnesses testified as to what the yelling was about. Based on this evidence, the jury had evidence on which to conclude defendant did not act in heat of passion. (*People v. Cole, supra*, 33 Cal.4th at p. 1216.) The jury had a credible evidentiary basis to find that when defendant told the victim, "let's talk," he meant just that: he wanted to talk and was not enraged.

We reject defendant's attempt to equate this case with the facts presented in *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*) (overruled on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110) and *People v. Elmore* (1914) 167 Cal. 205 (*Elmore*). In *Bridgehouse*, the defendant's wife had an affair "which had extended over a considerable period of time" with the victim. (*Bridgehouse, supra*, 47 Cal.2d at p. 406.) Defendant's wife refused to end her affair or to approve of defendant commencing divorce proceedings. And the defendant was "mentally and emotionally exhausted" when he was surprised to meet the victim at his mother-in-law's house. (*Id*. at p. 413.) The Supreme Court noted defendant's own testimony mirrored that of the police officers and it was undisputed defendant was "a man of excellent character" with a reputation for "peace and quiet." (*Id*. at p. 412.) Under these circumstances, the Supreme Court held the evidence, as a matter of law, established the homicide to be a crime committed with the heat of passion. (*Id*. at pp. 413–414.)

In *Elmore*, the undisputed evidence showed the victim, Fred W. Polio, insulted, slapped, and threatened the defendant in the town's saloon. (*Elmore, supra*, 167 Cal. at pp. 207–208.) After the defendant declined to step outside to fight the victim, the victim appeared ready to lunge at defendant. To this, defendant replied: "You son of a bitch, don't you hit me. You let me alone or I will hurt you." The victim ignored the threat, rushed at the defendant, and struck him on the shoulder. (*Id*. at p. 208.) As the victim struck defendant a second time, the defendant fatally stabbed the victim with a sharp, two-inch knife. (*Ibid*.) The Supreme Court held the mortal blow was struck with the heat of passion. (*Id*. at p. 210.) The *Elmore* court stated, "*Upon any reasonable view of the evidence in this case*, the first impression would be that the fatal wound was inflicted without legal malice and solely as the result of the sudden heat of passion excited

in Elmore by the unprovoked attack and violent blows of Polio." (*Id.* at p. 211, italics added.)

In contrast to the undisputed nature of the provocative acts presented in *Bridgehouse, supra*, 47 Cal.2d 406 and *Elmore, supra*, 167 Cal. 205 the evidence in this case does not show Montejano hit or rushed at defendant. There is no evidence defendant was mentally or emotionally exhausted when he met with Montejano. And Montejano's statement—"[I]f you're gonna shoot me, shoot me"—is not sufficient to prove provocation as a matter of law. In short, the evidence was not so clear and uncontradicted the jury was required to find defendant acted with heat of passion.

### 2. Imperfect Self–Defense

We also reject defendant's contention the jury was required to find he shot Montejano in imperfect self-defense, i.e., with an actual but unreasonable belief in the need to exercise self-defense.

As the California Supreme Court has explained, "'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he [or she] was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.'" (*In re Christian S.* (1994) 7 Cal.4th 768, 771), (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) The doctrine of imperfect self-defense has been described as "narrow" because it "requires without exception that the defendant must have had an actual belief in the need for self-defense." (*People v. Manriquez, supra*, 37 Cal.4th at p. 581.) Thus, the Supreme Court has also "'emphasize[d] what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with."' (*People v. Aris* [(1989)] 215 Cal.App.3d [1178,] 1192, italics added.)' (*In re Christian S.* (1994) 7 Cal.4th 768, 783; see also *People v. Wright* (2005) 35 Cal.4th 964, 974.)" (*Manriquez, supra*, at p. 581.)

Regardless of whether the evidence might have allowed the jury to find imperfect self-defense, the jury was not required to find imperfect self-defense. Instead, the evidence sufficed to support the jury's implicit rejection of the suggestion defendant acted with an actual but unreasonable belief in his need to defend himself from Montejano. The evidence supported the finding defendant was not

fearful when meeting Montejano. Defendant was armed with a gun when he met Montejano and led him away from the party to "talk." None of the witnesses testified Montejano threatened defendant when the shouting began. Instead, Griffin testified defendant shot Montejano immediately after the victim said, "[I]f you're gonna shoot me, shoot me." The jury relied on this evidence and it allowed the jury to reject imperfect self-defense.

Defendant relies on Montejano's possession of a gun during the argument as a basis to support an imperfect self-defense argument. However, no one saw Montejano's gun prior to the shooting. Only when defendant grabbed Montejano's backpack after the shooting did Sabala see the gun inside the backpack. Regardless of what defendant might have seen in Montejano's backpack, the jury had substantial evidence defendant armed himself and led the victim away from the party with an intent to shoot him. We conclude the evidence did not require the jury to conclude defendant shot Montejano in imperfect self-defense.

As the California Supreme Court noted in *Jackson, supra*, 62 Cal.2d at p. 528, there might be a case in which the evidence is uncontradicted and subject to only one interpretation so that murder must be reduced to voluntary manslaughter based on heat of passion or imperfect self-defense. Regardless of that possibility, this is not such a case. Here, the jury had evidence with which it could reasonably find defendant did not act with heat of passion or in imperfect self-defense.

(People v. Ramirez, slip op. at 3-8.)

### *Applicable Legal Standards*

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court

determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of <u>Jackson</u>.  <u>Juan H.</u>, 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam).  As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

<u>Coleman v. Johnson</u>, at 651 (citations omitted).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16.  In performing a <u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution and must defer to that resolution.  <u>Jackson</u>, 443 U.S. at 326.

Under <u>Jackson</u>, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain the conviction.  <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995).  The United States Supreme Court has recently even further limited a federal court's scope of review under <u>Jackson</u>, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos v. Smith</u>, 565 U.S. 1 (2011) (per curiam).  <u>Jackson</u> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." <u>Id.</u> at 2.  Under <u>Cavazos</u>, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" <u>Id.</u> at 2 (quoting <u>Renico v. Lett</u>, 559 U.S.

1  766, 773 (2010)).

2  *Analysis*

3  Preliminarily, respondent contends petitioner's claim does not state a federal claim

4  because the focus of his argument – evidence concerning heat of passion and imperfect self-

5  defense – are not elements of the crime of second degree murder, the proper focus of a

6  sufficiency of the evidence test.  (ECF No. 15 at 31-33.)  Respondent is correct that heat of

7  passion and imperfect self-defense are mitigating circumstances rather than elements of the crime

8  of murder.  See People v. Martinez, 31 Cal.4th 673, 685 (2003); People v. Rios, 23 Cal.4th 450,

9  461-62 (2000).

10  Nevertheless, and assuming petitioner is instead arguing that the evidence of malice

11  required to support a conviction for second degree murder is insufficient, the claim lacks merit.

12  Viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence to

13  support petitioner's second degree murder conviction beyond a reasonable doubt.

14  Under California law, murder is an unlawful killing with malice aforethought.  Cal. Penal

15  Code § 187(a).  Malice is express when the defendant manifests a deliberate intention to take

16  away the life of another.  People v. Blakeley, 23 Cal.4th 82, 87 (2000).  A defendant acts with

17  implied malice when he acts with an awareness of endangering human life.  People v. Knoller, 41

18  Cal.4th 139, 153 (2007).  Specifically, malice is implied "'when the killing results from an

19  intentional act, the natural consequences of which are dangerous to life, which act was

20  deliberately performed by a person who knows that his conduct endangers the life of another and

21  who acts with conscious disregard for life.'"  People v. Taylor, 48 Cal.4th 574, 623-24 (2010).

22  "Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing

23  from murder to voluntary manslaughter by negating the element of malice that otherwise inheres

24  in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser

25  necessarily included offense of intentional murder [citation]."  People v. Breverman, 19 Cal.4th

26  142, 153-154 (1998).

27  ////

28  ////

17

1    While the jury did hear the evidence cited and quoted by petitioner in support of his

2    claim,[4] it also heard evidence, and found it to be credible, from which reasonable inferences could

3    be made, supporting a finding of murder with malice.  More particularly, the jury heard evidence

4    that petitioner armed himself prior to electing to speak with the victim following the victim's

5    third approach (LD 5 440-44, 447, 462-65), that petitioner asked the victim to walk with him and

6    indeed walked to a location a few houses down from where the birthday party was being held (LD

7    4 149-51, 179-80, 186, 189, 253, 256-57, 259-60, 272; LD 5 445, 453, 543), that once at that

8    location, petitioner and the victim could not be observed, or only partially observed, because they

9    were behind a parked vehicle (LD 4 154, 263-65, 269-70, 272, 280), that petitioner and the victim

10   were arguing (LD 4 148-49, 153-54, 269), that the victim was heard saying, "So you're going to

11   shoot me?  Well shoot me then," or words to similar effect (LD 4 148-49, 153-54, 269), and that

12   petitioner fled the scene after the shooting (LD 4 193, 200, 269; LD 5 453, 459-60).  The jury

13   could have reasonably inferred malice from this evidence despite also hearing evidence offered to

14   establish heat of passion or self-defense.  The testimony a single witness suffices to uphold a

15   conviction.  Bruce v. Terhune, 376 F.3d at 957-58.  And, although it might have been possible to

16   draw a different inference from the evidence as petitioner argues, this court is required to resolve

17   such conflicts in favor of the prosecution.  See Jackson, 443 U.S. at 326.  Notably too, the

18   testimony of a single witness can prove a fact.  (CALCRIM 301 [LD 2 342].)

19   The state appellate court rejected petitioner's argument that the "jury was required as a

20   matter of law to accept evidence that would reduce murder to voluntary manslaughter" where

21   petitioner did "not deny he engaged in an intentional homicide or that the evidence as sufficient to

22   convict him of second degree murder."  (LD 12 at 5-7.)  It went on to apply Jackson to the

23   evidence considered by the jury, stating "two witnesses testified they watched defendant argue

24   with Montejano, pull out a gun, and repeatedly shoot Montejano."  (LD 12 at 10.)  Later,

25   _____

26   [4] Petitioner quotes, in part, from the sentencing transcript to support his claim.  (ECF No. 1 at 8, 10 [citing to LD 6 at 849, 851-52].)  However, the judge's comments at sentencing are not
27   relevant to an analysis of whether there was any evidence the jury – the trier of fact – could have found sufficiently credible to support its verdict.  Cavazos, 565 U.S. at 2 (responsibility of jury,
28   not the court, to make determination).

addressing the legal fact that heat of passion or an imperfect self-defense may negate malice, the state appellate court considered that evidence as well. As to heat of passion, it noted "the evidence showed defendant invited Montejano to go down the street saying, '[Y]ou want to talk, let's talk.' After defendant and Montejano walked several houses away, the two began shouting at each other. None of the witnesses testified as to what the yelling was about. Based on this evidence, the jury had evidence on which to conclude defendant did not act in heat of passion." (LD 12 at 12-14.) With regard to imperfect self-defense, the state court held "the evidence sufficed to support the jury's implicit rejection of the suggestion defendant acted with an actual but unreasonable belief in his need to defend himself from Montejano. The evidence supported the finding defendant was not fearful when meeting Montejano. Defendant was armed with a gun when he met Montejano and led him away from the party to 'talk.' None of the witnesses testified Montejano threatened defendant when the shouting began. Instead, Griffin testified defendant shot Montejano immediately after the victim said, '[If you're gonna shoot me, shoot me.'" (LD 12 at 14-16.) The undersigned notes these factual determinations are reasonable. 28 U.S.C. § 2254(d)(2).

In short, the record does not compel the conclusion that no rational trier of fact could have found that petitioner was guilty of second-degree murder, particularly considering the double deference owed under Jackson and the AEDPA. The state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. 28 U.S.C. § 2254(d)(1). Therefore, the undersigned recommends this claim be denied.

Ground Two: *Prosecutorial Misconduct*

Petitioner claims that the prosecutor's closing argument regarding the legal standard for a finding of voluntary manslaughter and how the jury should approach its consideration lessened the prosecutor's burden depriving him of due process and a fair trial. (ECF No. 1 at 11-15.) Respondent replies that the court of appeal's determination was neither unreasonable nor contrary to Supreme Court authority, thus barring relief in these proceedings. (ECF No. 15 at 35, 47-50.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed

this claim as follows:

Defendant contends the prosecutor engaged in misconduct during closing arguments by misstating the law regarding voluntary manslaughter and the order of deliberations. In his supplemental letter brief, he adds to the argument on the basis of the California Supreme Court's decision of *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*) that was decided after the original briefing was completed. And at oral argument, he brought to our attention the case of *People v. Lloyd* (2015) 236 Cal.App.4th 49 (*Lloyd*). We have considered the argument and cited authority, but conclude there was no reversible error.

## A.   Review of Claimed Prosecutorial Misconduct at Trial

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. 'A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"" (*People v. Espinoza, supra*, 3 Cal.4th at p. 820.)" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

"Regarding the scope of permissible prosecutorial argument, ""a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his [or her] case and is not limited to 'Chesterfieldian politeness'" [citation], and he [or she] may "use appropriate epithets. ..." (*People v. Wharton* [(1991)] 53 Cal.3d [522,] 567–568.)' (*People v. Williams* (1997) 16 Cal.4th 153, 221.)" (*People v. Stanley* (2006) 39 Cal.4th 913, 951–952.)

……………………………………………………………………….

## C.  Prosecutor's Closing Argument Regarding Heat of Passion

Defendant next contends the prosecutor's closing argument prejudicially misstated the law regarding the heat of passion defense to second degree murder. The Attorney General responds that the

claim has not been preserved for appeal for lack of request to admonish the jury regarding alleged misstatement of the law. We find the issue is cognizable but conclude the error on this point was not prejudicial.

In arguing against a conviction for voluntary manslaughter, the prosecutor stated the following during closing arguments:

"Heat of passion. Was the defendant provoked?

"As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his judgment.

"Was he provoked when Montejano was trying to fight with him? Maybe.

"Did it get him to act rashly?

"That's debatable.

"But here's where it gets lost: [¶] The provocation would have caused a person of average disposition—once again, not someone in the position of the defendant; a regular average person, okay. The standard that we all would judge ourselves by. That it would cause an average person to act rashly and without deliberation.

"*Basically was that provocation so strong, Montejano's challenge to a fight was so strong that the average person would think that what I need to do is pull out a gun and shoot him six times*.

"[Defense counsel]: I will object. That misstates the law.

"THE COURT: All right if I can see you both at sidebar briefly?

"(Unreported discussion held at bench)

"THE COURT: I'll overrule the objection as far as what is printed on the screen, and counsel can—[the prosecutor] can explain what he meant, and what is on the screen is taken from the jury instruction with regard to Element Number Three.

"[The prosecutor]: You are going to get a jury instruction that will have all of the facts, and you are going to look at it, and you will see that it says that provocation would have caused a person of average disposition to act rashly and without due deliberation.

"So what provocation are we talking about?

"We are talking about Montejano challenging Ramirez to a fight.

21

"Okay. *That's the provocation that would have caused a person of average disposition, what's the rash action and deliberation? Shooting him.*" (Italics added.)

As the colloquy shows, defense counsel timely objected when the People first misstated the definition for provocation justifying heat of passion. In the wake of the trial court's overruling the objection, the defense was excused from having to request that the jury be admonished or to raise another, futile objection after the second misstatement of law. "[T]he absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' (*People v. Green* (1980) 27 Cal.3d 1, 35, fn. 19 ...; *People v. Pitts* (1990) 223 Cal.App.3d 606, 692; *People v. Lindsey* (1988) 205 Cal.App.3d 112, 116, fn. 1; see also *People v. Noguera* [(1992) 4 Cal.4th 599,] 638 [must request curative admonition 'if practicable'].)" (*People v. Hill* (1998) 17 Cal.4th 800, 820–821, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069 & fn. 13.) A defendant is also excused from having to make a futile objection after the trial court has overruled an objection. (*Hill* at pp. 820–821.) Consequently, the issue has been preserved for appeal.

The trial court instructed the jury with CALCRIM No. 570 regarding voluntary manslaughter based on heat of passion. In pertinent part, the court informed the jury:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked.

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from heat of passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person

to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient."

The trial court further instructed: "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Here, the prosecutor explained heat of passion by arguing it would cause the average person to draw a gun and shoot the victim six times.

In his supplemental opening brief, defendant argues the italicized portion of the prosecutor's argument misstated the law as articulated in *Beltran, supra*, 56 Cal.4th 935 when arguing the test for provocation asked whether "the average person would think that what I need to do is pull out a gun and shoot him six times." The Attorney General concedes the contention has merit in light of the *Beltran* court's holding provocation requires only that "a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his [or her] particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection." (*Beltran, supra*, 56 Cal.4th at p. 949.)

We agree the prosecutor's statement is not a correct statement of the law. The heat of passion defense to second degree murder requires only that the provocation "'cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" (*Beltran, supra*, 56 Cal.4th at p. 942, quoting *People v. Barton* (1995) 12 Cal.4th 186, 201.) "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. *How the killer responded* to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223, italics added.)

However, the prosecutor's misstatement of the law of heat of passion was immediately followed by the prosecutor's statement that the jury

should follow the court's instruction on the law regarding provocation. This curative comment also applies to the prosecutor's brief return to the theme the shooting was not a warranted response to the provocation. Specifically, the prosecutor referred as follows to Montejano's challenging Ramirez: "That's the provocation that would have caused a person of average disposition, what's the rash action and deliberation? Shooting him." This comment followed almost immediately the prosecutor's indication that the jury should rely on the jury instruction on voluntary manslaughter.

Moreover, the record indicates the prosecutor's misstatements were made while the correct statement of the law of provocation was displayed for the jury. At oral argument, the parties did not disagree the trial court's reference to "what is on the screen is taken from the jury instruction with regard to Element Number Three" of voluntary manslaughter displayed the correct statement of law for the jury. Thus, the trial court's reference to the screen indicates the misstatements were cured as soon as they were committed. As we have already noted, we presume the jury understood and followed the trial court's instructions. (*People v. Williams, supra*, 170 Cal.App.4th at p. 635.) Nothing in the record undermines this presumption that jurors properly heeded the court's instruction displayed for them on the screen during the prosecutor's misstatement of the law regarding provocation and reiterated by the trial court's instructions.

The prosecutor's express direction in this case that the jury should look to the jury instructions regarding the law of provocation sets this case apart from the circumstance presented in *Lloyd, supra*, 236 Cal.App.4th 49. *Lloyd* involved multiple misstatements of the reasonable doubt standard by the prosecutor. The prosecutor in *Lloyd* erred "[b]y equating a not guilty verdict based on self-defense or defense of others as meaning the defendant must establish the defense to the point the jury considers his [or her] actions 'absolutely acceptable' and by arguing not guilty means the defendant is innocent ...." (*Id*. at p. 63.) Defense counsel objected, but the trial court overruled the objection. (*Id*. at p. 63.) The *Lloyd* court reversed under the totality of the circumstances even though the jury was later correctly instructed on the reasonable doubt standard. (*Id*. at p. 52.) In reversing, the *Lloyd* court noted it is "improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*Id*. at p. 62, quoting *People v. Hill* (1998) 17 Cal.4th 800, 829–830.)

The prejudice in *Lloyd, supra*, 236 Cal.App.4th 49 derived from the uniquely pivotal role the reasonable doubt standard plays in informing the jury and the fact the jury's mistaken understanding of

24

the standard was reinforced by the trial court's overruling of the defense's objections so that the misconceptions were not corrected until the jury was later instructed by the court. (*Lloyd*, at p. 63.) By contrast, in this case the prosecutor's misstatements of an element of voluntary manslaughter coincided with the prosecutor's pointing to the jury instructions as the correct statement of law. The prosecutor told the jury: "You are going to get a jury instruction that will have all of the facts, *and you are going to look at it ....*" (Italics added.) Although not as powerfully corrective as an admonishment by the trial court to follow the jury instructions, the prosecutor's statement had sufficient curative effect to alleviate his earlier misstatement.

Accordingly, we conclude the court's instructions cured the prosecutor's misstatement of the law regarding voluntary manslaughter.

(People v. Ramirez, slip op. at 10-13.)

### *Applicable Legal Standards*

The United States Supreme Court has made clear that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295 U.S. 78, 88 (1935). To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986); Parker v. Matthews, 567 U.S. 37, 45 (2012) (confirming that Donnelly/Darden is the proper standard). Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim. See Duckett v. Godinez, 67 F.3d 734, 743 (9th Cir. 1995). A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice. Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation). And, because "the Darden standard is a very general one," courts have "more leeway...in reaching outcomes in case-by-case determinations." Parker, 567 U.S. at 48 (internal quotation marks omitted).

In order to determine whether prosecutorial misconduct occurred, it is necessary to examine the entire proceedings and place the prosecutor's remarks in context. See Greer v.

Miller, 483 U.S. 756, 765-66 (1987). Relief is limited to cases in which the petitioner can

establish that the misconduct resulted in actual prejudice. Johnson v. Sublett, 63 F.3d 926, 930

(9th Cir. 1995) (citing Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)). Put another way,

prosecutorial misconduct violates due process when it has a substantial and injurious effect or

influence in determining the jury's verdict. See Karis v. Calderon, 283 F.3d 1117, 1128 (9th Cir.

2002); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

*Analysis*

Specifically alleging prosecutorial misconduct in violation of his due process and fair trial

rights, petitioner contends that during argument concerning the lesser included crime of voluntary

manslaughter, after addressing the necessary provocation, the prosecutor committed prejudicial

misconduct by asking, "[b]asically was that provocation so strong, Montejano's challenge to a

fight so strong that the average person would think that what I need to do is pull out a gun and

shoot him six times," to which defense counsel immediately objected. (LD 6 at 727.)

Following a review of the record pertaining to the prosecutor's closing argument, the

undersigned agrees with the state court that error occurred during argument concerning the law of

voluntary manslaughter, and further agrees with the state court's determination that although the

prosecutor erred, petitioner was not prejudiced by the error.

As noted above, the trial court acted upon defense counsel's objection, overruling "the

objection as far as" what was displayed to the jury. (See LD 6 726-28.) In other words, the

prosecutor's spoken words were wrong, but the jury instruction displayed during closing

argument was legally correct. That instruction, CALCRIM 570, provides as follows:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> The defendant killed someone because of a sudden quarrel or in the heat of passion if:
>
> 1.  The defendant was provoked;
>
> 2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND

26

3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

[If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder.

(LD 2 367-68; see also LD 6 786-88.)

The jury was also instructed that it "must follow the law as [the court] explain[s] it to you even if you disagree with it. If you believe that the attorneys' comments on the law conflicts with [the court's] instructions, you must follow [the court's] instructions." (LD 6 767; LD 2 327 [CALCRIM 200].) The jury was further instructed regarding justifiable homicide (LD 6 781-83; LD 2 356-58 [CALCRIM 570]) and imperfect self-defense (LD 6 788-89; LD 2 369-70 [CALCRIM 571]). Petitioner does not dispute that the jury was properly instructed on the law of voluntary manslaughter. Significantly too, nothing in the record indicates that the jury failed to follow the court's instructions or that the jury discarded the instructions in favor of the prosecutor's argument. In fact, in that circumstance, this court must presume the jury followed the court's instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000). Viewing the prosecutor's

27

argument in the context of the given jury instructions and the entire trial, there was no due process violation. For the same reasons articulated in the court of appeal's determination, petitioner fails to demonstrate actual prejudice.

The state appellate court's rejection of petitioner's claim is not contrary to, or an unreasonable application of clearly established federal law applicable to the issue. 28 U.S.C. § 2254(d)(1). For the reasons set forth by the state appellate court, the prosecutor's error did not render petitioner's trial fundamentally unfair in violation of due process. Furthermore, petitioner fails to demonstrate prejudice because the prosecutor's error did not have substantial or injurious effect or influence in determining the jury's verdict. Under the circumstances of this case, there is no reasonable probability that the outcome at trial would have been different, but for the prosecutor's misstatement of the law on voluntary manslaughter during closing arguments. Hence, the undersigned recommends the claim be denied.

Ground Three: *The Prosecutor's Closing Argument*

In his third claim, petitioner contends the prosecutor committed misconduct by telling the jury it "could not 'even get into a discussion about . . . voluntary manslaughter' until and unless they first found petitioner not guilty of first and second degree murder." (ECF No. 1 at 15.) Petitioner further contends trial counsel was ineffective for failing to object to the prosecutor's comments. (ECF No. 1 at 16.) Respondent maintains the state court's rejection of petitioner's claim was reasonable and precludes relief. (ECF No. 15 at 35, 42-47.)

The Third District Court of Appeal addressed this claim on direct appeal as follows:

**Statements Regarding Order of Jury Deliberations**

Defendant contends the prosecutor misadvised the jury by asserting an incorrect constraint on the order of deliberations. Specifically, defendant refers to the following portion of the People's closing argument:

"Now, there are some other laws I want to talk about because we've got first degree murder. We've got second degree murder, and then there is something after that called voluntar[y] manslaughter, which is a lesser included.

"Now, first, remember this:

*"You don't even get into a discussion about is this voluntary manslaughter unless each and every one of you find him not guilty of first degree murder, and then you would have to find him not guilty of second degree murder before you would even get there*, and it's one of these things where the reason this is up here isn't because voluntary manslaughter is what he is guilty of. It is because I want to use this as an opportunity to explain to you why voluntar[y] manslaughter is not something you should consider; why voluntar[y] manslaughter is not justice, and, once again apply the facts ...." (Italics added.)

Defendant contends the italicized portion of the argument constitutes prosecutorial misconduct because it incorrectly constrained the jury to a particular order for its deliberations. (See *People v. Dennis* (1998) 17 Cal.4th 468, 536 ["[A] trial court should not tell the jury it must first unanimously acquit the defendant of the greater offense before deliberating on or even considering a lesser offense"].) However, the defense did not object to the argument at trial. For lack of objection, the contention has not been preserved for appellate review. As the Supreme Court has held, "'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)' [Citation.]" (*People v. Stanley, supra*, 39 Cal.4th at p. 952.)

Anticipating our conclusion the contention has not been preserved for review, defendant alleges he received ineffective assistance of counsel due to the lack of objection to the prosecutor's argument. "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) Under the United States and California Constitutions, a criminal defendant is entitled to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 694, 80 L.Ed.2d 674 (*Strickland*); *In re Fields* (1990) 51 Cal.3d 1063, 1069.) "This right "'entitles the defendant not to some bare assistance but rather to effective assistance. Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.'""" (*In re Fields, supra*, 51 Cal.3d at p. 1069, quoting *In re Cordero* (1988) 46 Cal.3d 161, 180.) "If counsel's performance has been shown to be deficient, the defendant is entitled to relief only if it can additionally be established that he or she was prejudiced by counsel's deficient performance. (*Strickland, supra*, at pp. 691–692; accord, [*People v.] Ledesma* [(1987)] 43 Cal.3d at p. 217.) As to these issues, the defendant bears the burden of proof.

29

([*People v. Pope* (1979) 23 Cal.3d 412,] 425.)" (*In re Edward S.* (2009) 173 Cal.App.4th 387, 407.)

Here, we conclude defendant cannot establish prejudice due to defense counsel's failure to object because the trial court properly instructed the jury it had discretion to determine the order of deliberations. The jury was instructed with CALCRIM No. 640 on the consideration of lesser offenses, as follows:

"[Y]ou will be ... given verdict forms for guilty and not guilty of first degree murder (,/and) [second degree murder] [,/and) ] voluntary manslaughter] [¶] You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder only if all of you have found the defendant not guilty of first degree murder, [and I can accept a verdict of guilty or not guilty of voluntary manslaughter only if all of you have found the defendant not guilty of both first and second degree murder]."

The jury was additionally instructed with CALCRIM No. 200 that: "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

We presume the jury understood and followed the trial court's instructions. (*People v. Williams* (2009) 170 Cal.App.4th 587, 635.) Accordingly, we conclude any error by the People in misdescribing the order of deliberations to be undertaken by the jury was nonprejudicial.

(People v. Ramirez, slip. op. at 20-26; LD 12 at 17-20.)

### *Legal Standards*

The legal standards applicable to a prosecutorial misconduct were outlined above in the discussion regarding ground two.

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in Strickland v. Washington, 466 U.S. 668 (1984). To succeed on a Strickland claim, a petitioner must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." Id. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." Id. at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the [petitioner] of a

fair trial, a trial whose result is reliable.'" Richter, 562 U.S. at 114 (quoting Strickland, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 669; see Richter, 562 U.S. at 114. Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotation marks & alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. A reviewing court "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." Strickland, 466 U.S. at 697.

*Analysis*

To review, the comments at issue in ground three are the following:

> Now, there are some other laws I want to talk about because we've got first degree murder. We've got second degree murder, and then there is something after that called voluntarily manslaughter, which is a lesser included.

> Now, first, remember this:

> You don't even get into a discussion about is this voluntary manslaughter unless each and every one of you find him not guilty of first degree murder, and then you would have to find him not guilty of second degree murder before you would even get there, and it's one of these things where the reason this is up here isn't because voluntary manslaughter is what he is guilty of. It is because I want

31

> to use this as an opportunity to explain to you why voluntary[y] manslaughter is not something you should consider; why voluntary[y] manslaughter is not justice, and, once again, apply the facts ….

(LD 6 at 726-27.)

As the state court held, defense counsel did not object to the prosecutor's statement and therefore the argument was not preserved for review on appeal. (LD 12 at 18.) The state appellate court went on to find, after applying Strickland, that petitioner could not show prejudice for counsel's failure to object "because the trial court properly instructed the jury it had discretion to determine the order of deliberations." (LD 12 at 19.) Those findings are reasonable.

In this case, the jury was expressly instructed it was to follow the law as the trial court explained it and that if "the attorneys' comments on the law" were in conflict with its instructions, the jury was to follow the trial court's instructions rather than an attorney's comments. (LD 2 at 327; LD 6 at 767 [CALCRIM 200].) The jury was also instructed pursuant to CALCRIM 640, which provides in relevant part:

> You will be given verdict forms for guilty and not guilty of first degree murder, second degree murder, and voluntary manslaughter.
>
> *You may consider these different kinds of homicide in whatever order you wish ….*

(LD 6 at 789-90; LD 2 at 371 [italics added].)

As noted in the discussion of petitioner's claim in ground two, a review of the record does not reveal any indication that the jury disregarded the law as instructed by the trial court. Therefore, the undersigned will presume the jury followed the trial court's instructions. Weeks v. Angelone, 528 U.S. at 234.

Moreover, for the same reasons, the state appellate court's finding that petitioner was unable to establish prejudice is reasonable. In the absence of evidence that the jury disregarded the trial court's instructions pursuant to CALCRIM 200 and 640, petitioner cannot show that but for trial counsel's failure to object to the prosecutor's statement there was a reasonable probability that the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694.

32

In sum, the Third Appellate District's determination regarding this claim is not unreasonable, nor is it contrary to Supreme Court precedent. 28 U.S.C. § 2254(d)(1). As a result, federal relief is not warranted, and this claim should be denied.

Ground Four: *Defense of Others Instruction*

Next, petitioner complains the trial court's refusal to instruct the jury regarding the defense of others violated his constitutional rights. (ECF No. 1 at 18-20.) Respondent counters the claim is barred by Teague, that there was no constitutional error in the first instance, and, alternatively, that any error was harmless. (ECF No. 15 at 50-63.)

In its reasoned opinion, the state appellate court determined the following:

> ***Whether the Trial Court Had a Duty to Instruct on Defense of Others***
>
> The trial court instructed the jury on self-defense with respect to the murder charge and on imperfect self-defense as it related to voluntary manslaughter. However, the court did not instruct on defense of others as a defense either to murder or voluntary manslaughter. Defendant contends the trial court should have instructed sua sponte on defense of others based on the threat posed by Montejano to others at the birthday party defendant had been attending. We conclude any error was harmless.
>
> ***A. Trial Court Refusal to Instruct on Defense of Others***
>
> During the conference on jury instructions, the following colloquy occurred on the issue of whether to instruct on defense of others:
>
> "[THE COURT:] This is CALCRIM 505, justifiable homicide, self defense or defense of another.
>
> "The instruction as I'm proposing to edit it would only apply to self-defense and not defense of others for the following reasons.
>
> "There are threats that are made to others, referring to kids and bitches and things at the party. It's my perception that those kinds of threats are covered on page two at line[s] six through line 14.[Fn. omitted.]
>
> "For example, at line nine it says if you find that ... the victim threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.
>
> "Here the defendant and the victim had three series of—of altercations, verbal altercations, the victim comes to the party seeking the defendant, makes statements at different times. The last altercation is the one that ultimately leads to the shooting.

"There are statements that threaten the group in general.

"However, in the last incident the two men walk away from the party, Box, the defendant ... reportedly says that they want[ ] to settle it old school.

"They walk several houses—two or three houses down the street away from everyone else. And then the evidence most favorable to the defense, the victim reaches for a gun and the defendant acts in self-defense and shoots.

"At that moment in time no matter what version you believe, the People's, that the defendant premeditated and planned it, got the gun from [Daniel Uribe] and was isolating the defendant away from the party or isolating the victim rather away from the party, which the People would argue that it was a setup to get him into a narrative, that he's away from everyone to kill him.

"Or, if you believe the defendant's version, there is no one in his immediate proximity that the defendant is acting to defend. He is not defending himself at that moment.

"And I would note that the—it says in bullet number two on page one at line 18, the defendant reasonably believed that the immediate—immediate use of deadly force was necessary to defend.

"And he—at that moment when he draws his gun, the defense will argue that the victim has reached for the backpack which contains a gun, but the defendant's not ... intervening to protect another person. He is acting to defend his own life at that time.

"In addition, while guns can shoot at long-range, the present ability is yes, existent in the sense that the victim has a gun on his body, but is not aiming it. It's in the backpack. He's not aiming it at the crowd.

"He hasn't just now said I'm going to shoot the F-ing kids and bitches or things like that. And thus the defendant's intervening.

"The motion to the gun from all the evidence, no matter whose perspective, it seems to be a threat if at all of the defendant .... So I don't think there is defense of others factually at all at that moment."

Despite these findings, the defense requested instruction on defense of others. On this point, the trial court inquired whether the defense intended to argue defendant was "acting to defend a specific person or a group of people." Defense counsel responded he was "not ruling it out" but such argument was "unlikely." During closing arguments, the defense asserted: "You have the right to protect yourself is what you have. You don't have to make assumptions that will get you killed." However, defense counsel did not argue defendant acted to quell an immediate threat to others—only that he acted in reasonable self-defense.

////

## B.  Defense of Others

Imperfect defense of another has also been recognized by the California Supreme Court to negate malice and reduce murder to voluntary manslaughter. An actual but unreasonable belief in the need to defend another person from immediate harm is required. "One who kills in imperfect self-defense—in the actual but unreasonable belief he [or she] must defend himself [or herself] from imminent death or great bodily injury—is guilty of manslaughter, not murder, because he [or she] lacks the malice required for murder. [Citations.] For the same reason, one who kills in imperfect defense of others—in the actual but unreasonable belief he [or she] must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter." (*People v. Randle* (2005) 35 Cal.4th 987, 996–997, overruled on another ground in *People v. Sarun Chun* (2009) 45 Cal.4th 1172, 1200–1201.)

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531, quoted in *People v. Breverman* (1998) 19 Cal.4th 142, 154.) [¶] This duty to instruct sua sponte applies to defenses that are not inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) [¶] However, 'the court's obligation to instruct sua sponte extends only to those general principles of law "closely and openly connected with the facts before the court."' (*People v. Guzman* (1988) 45 Cal.3d 915, 952.)" (*People v. Watie* (2002) 100 Cal.App.4th 866, 881–882, fns. omitted.) However, even if the defendant asks for instruction on a particular defense, "the court must 'give a requested instruction concerning a defense only if there is substantial evidence to support the defense.'" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823, quoting *People v. Moore* (2002) 96 Cal.App.4th 1105, 1116.) "'Even so, the test is not whether any evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that "deserve[s] consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [people] could have concluded'" that the specific facts supporting the instruction existed. [Citations.]' (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)" (*People v. Larsen, supra*, at p. 824.)

## C.  Harmless Error Analysis

Assuming for the sake of argument the trial court erred in refusing to instruct on defense of others, we assess whether such error would require reversal. In engaging in an analysis of prejudice, we begin by determining the applicable standard. The People argue defendant's contention regarding failure to properly instruct on voluntary manslaughter, a lesser included offense of second degree murder, constitutes an error of state law that is reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). As the People correctly note, proof of imperfect self-defense would have reduced

murder to its lesser included offense of voluntary manslaughter. (*People v. Duff* (2014) 58 Cal.4th 527, 561–562.)

Defendant contends we should instead employ the analysis of prejudice that applies to errors of federal constitutional dimension under *Chapman v. California* (1967) 386 U.S. 18, 24, 17 L.Ed.2d 705 (*Chapman*). In so arguing, defendant relies on *People v. Thomas* (2013) 218 Cal.App.4th 630. In *Thomas*, the Court of Appeal considered the applicable standard for prejudice after the California Supreme Court transferred the case back with directions to consider whether refusal to instruct the jury on heat of passion voluntary manslaughter amounted to federal constitutional error. (*Id*. at p. 633.) Although the *Thomas* court had initially applied the *Watson* test, after the transfer it concluded the *Chapman* standard applied. The *Thomas* court explained that "this case concerns the court's duty to give a requested instruction, not the sua sponte duty to instruct [on a lesser included offense] at issue in [*People v.*] *Breverman* [ (1998) 19 Cal.4th 142]. In any event, the legal classification of heat of passion manslaughter as a lesser included offense of murder does not end the analysis. Heat of passion manslaughter is a lesser included offense of murder, facts permitting, because it negates the element of malice. ([*People v.*] *Rios* [(2000)] 23 Cal.4th [450,] 454, 461.) If provocation is properly presented in a murder case, then, proving the element of malice requires the People to prove the absence of provocation beyond a reasonable doubt. (*Id*. at p. 462.) '[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution.' (*People v. Flood* [(1998)] 18 Cal.4th [470,] 491.)" (*Thomas*, at p. 644.)

We need not resolve the issue of whether *Watson, supra*, 46 Cal.2d 818 or *Chapman, supra*, 386 U.S. 18 applies in this case because we conclude the claimed instructional error is harmless under both standards. In other words, any error in the trial court's refusal to instruct on self-defense is harmless beyond a reasonable doubt. Here, the jury rejected the defenses of self-defense and imperfect self-defense. Defendant's claims of self-defense were stronger than any claim of defense of others he might have had. Montejano showed up at the party to challenge defendant to a fight. Defendant was Montejano's object of scorn because of a perceived slight committed a week earlier when defendant pulled the hair of Montejano's ex-girlfriend and the mother of his child. Although Montejano showed up three times at the party attended by defendant, Montejano did not assault any of the other guests. Instead, Montejano left twice upon being told to resolve his gripe with defendant after the party.

In short, Montejano sought to fight defendant only. Other party guests did not perceive themselves to be in danger from Montejano. As the trial court noted during the conference on jury instructions, "if you believe the defendant's version, there was no one in his immediate proximity that the defendant is acting to defend." Consistent with this, defense counsel did not argue defendant acted in defense of others but only in self-defense. The jury, however, did not credit the self-defense argument. Nor did the jury find imperfect

self-defense. Instead, it convicted defendant of second degree murder. The jury's rejection of self-defense and imperfect self-defense renders any error in failure to instruct on defense of others harmless under any standard of prejudice.

(People v. Ramirez, slip. op., at 26-32.)

### Applicable Legal Standards

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "It is not the province of a federal court to reexamine state court determinations of state law questions." Estelle, 502 U.S. at 71-72. "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006). "[A] petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

Applying federal common law and the federal rules of criminal procedure, the United States Supreme Court has held, "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988). No federal precedent requires, however, that a state trial court instruct, sua sponte, on affirmative defenses in a criminal trial where unsupported by the evidence.

Where the alleged error is the failure to give an instruction, the burden on the petitioner is "'especially heavy'" because "an omission ... is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Clark v. Brown, 450 F.3d at 904; see also Duckett v. Godinez, 67 F.3d at 746 ("We ask whether, under the instructions as a whole and given the evidence in the case, the failure to give the [omitted] instruction rendered the trial so fundamentally unfair as to violate federal due process") (citing Cupp v. Naughton, 414 U.S. 141, 147 (1973)). Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. Brecht v. Abrahamson, 507 U.S. at 637. If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. O'Neal v. McAninch, 513 U.S. 432, 437 (1995).

37

A federal court's review of a claim of instructional error is highly deferential. <u>Masoner v. Thurman</u>, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. <u>Id.</u> The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. <u>Henderson</u>, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." <u>Solis v. Garcia</u>, 219 F.3d 922, 927 (9th Cir. 2000) (quoting <u>Estelle</u>, 502 U.S. at 72).

"A 'substantial and injurious effect' means a 'reasonable probability' that the jury would have arrived at a different verdict had the instruction been given." <u>Byrd v. Lewis</u>, 566 F.3d 855, 860 (9th Cir. 2009) (quoting <u>Clark</u>, 450 F.3d at 916). To determine if petitioner was prejudiced, the court will consider: "(1) the weight of evidence that contradicts the defense; and (2) whether the defense could have completely absolved the defendant of the charge." <u>Id.</u> (citing <u>Beardslee v. Woodford</u>, 358 F.3d 560, 578 (9th Cir. 2004). The burden on Petitioner "is especially heavy where ... the alleged error involves the failure to give an instruction." <u>Id.</u> (quoting <u>Clark</u>, 450 F.3d at 904) (internal citations omitted).

### *Teague v. Lane*

Respondent asserts petitioner's claim is barred by <u>Teague v. Lane</u>, 489 U.S. 288 (1989). (<u>See</u> ECF No. 15 at 54-58.)

In <u>Teague</u>, the Supreme Court held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." <u>Teague</u>, 489 U.S. at 310. Under <u>Teague</u>, a new rule of constitutional law cannot be applied retroactively on federal collateral review to upset a state conviction or sentence unless the new rule forbids criminal punishment of primary, individual conduct or is a "watershed" rule of criminal procedure. <u>Id.</u> at 311-13; <u>Caspari v. Bohlen</u>, 510 U.S. 383, 396 (1994). The Supreme Court has made clear that federal habeas courts must decide at the outset whether <u>Teague</u> is implicated if the state argues that the petitioner seeks the benefit of a new rule. <u>Caspari</u>, 510 U.S.

at 389.  This is true regardless of whether the case is governed by the AEDPA standard of review.

See Horn v. Banks, 536 U.S. 266, 272 (2002).

To determine whether a habeas petitioner is entitled to the application of a particular rule, the habeas court performs a three-step analysis under Teague:  (1) the date on which the defendant's conviction became final is determined; (2) the habeas court considers whether the rule is new; and (3) if the rule is new, the court determines whether the rule nonetheless falls within one of the two narrow exceptions.  O'Dell v. Netherland, 521 U.S. 151, 156-57 (1997).

"In general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government."  Teague, 489 U.S. at 301.  Put another way, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final."  Id.  Here, petitioner's conviction became final on April 25, 2017, when the ninety-day period for petitioner to petition the United States Supreme Court for a writ of certiorari expired.  Respondent contends that granting relief on Ground 4 of the Petition would require that a new rule of constitutional law be announced, namely that a defendant's right to present a defense in a criminal trial includes the right to have the jury instructed on lesser-included offenses.

The undersigned agrees with respondent that granting relief on this claim would require that a new rule of constitutional law be announced.  The United States Supreme Court has never held that a defendant has a constitutional right to a jury instruction on a lesser offense in a non-capital case.  See Beck v. Alabama, 447 U.S. 625 (1980) (death sentence is not constitutionally imposed after a jury verdict of guilt on a capital offense where the jury was not permitted to consider a lesser included non-capital offense when the evidence supported such a verdict).  Moreover, the Ninth Circuit Court of Appeals explicitly has held that the failure of a state court to instruct on a lesser offense in a non-capital case does not present a federal constitutional question.  See James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976); see also, e.g., Solis v. Garcia, 219 F.3d at 929; Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984).

Although there does appear to be federal precedent for the proposition that the Due

Process Clause entitles a defendant to "an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," such cases have addressed the trial court's denial of a defendant's request for instruction on a particular defense. See, e.g., Mathews v. United States, 485 U.S. at 63; Bashor, 730 F.2d at 1240. Additionally, petitioner has made no contention that either of Teague's exceptions applies here.[5]

Accordingly, it does appear to the undersigned that petitioner's instructional error claim is at least arguably barred by the Teague doctrine. Nevertheless, the claim will be addressed on the merits.

*Analysis*

In addition to the colloquy quoted in the state court's opinion, the following also occurred:

> THE COURT: … There are prior threat[s] which would create a hypered - - hyper state of awareness in the defendant arguably.
>
> And those paragraphs will be given on the second page, but I don't think this is an immediate threat to the others at the time the shooting occurs.
>
> That's the Court's view, but I wanted to hear the defense view.
>
> [DEFENSE COUNSEL]: Guess my - - I - - I understand the Court's - - Court's view.
>
> I - - my request would be that that language be included only based on the fact that there was evidence that Montejano, when he comes back the third time, wants Ramirez thrown out of the party.
>
> And he says essentially, if that's not done, there's gonna be consequences to this house where the kids are. And then Ramirez and he go walk down the street afterward.
>
> So my request would be is that evidence - -
>
> THE COURT: At that moment of the threat if the shooting had occurred, right. I think one could infer that your client arguably is acting to defend others but he does in fact leave the party.
>
> [DEFENSE COUNSEL]: Right.
>
> THE COURT: And go down the street.
>
> [DEFENSE COUNSEL]: Right. So my - - my request is to include it based on that interpretation.

---

[5] Petitioner did not file a traverse or otherwise reply to respondent's answer.

I understand the Court's position, and I agree that there was - - they did walk two houses down, which is there ultimately the shooting happened away from the house. I do agree with that - - with those facts.

(See LD 6 at 676-79.) After hearing the People's position (LD 6 at 679-80), the trial court concluded as follows:

THE COURT: I just don't see - - I see the threats as being a legitimate basis as set out on page two of this instruction is relevant to your client's state of mind.

You know, certainly the guy's come by twice screaming and yelling, the victim. That you know he's named Criminal. You know that creates a legitimate state of mind of fear as well as provocation and concerns for people at the party. Totally legitimate.

But it seems at the moment or the space in time when this shooting occurs they do walk down the street. They go away from everyone at the party.

I just don't think that there is a person that reasonably one can say that your client is acting to protect.

If anything, he's acting to protect the people at the party by walking the victim away from the party. And therefore, that act of moving the victim away from them does protect the people arguably by getting him out of the - - the area. But I don't think in the true essence of the word it applies to this instruction.

And I think - - I don't think there is any evidence or sufficient evidence to give that, so I would strike the reference to defense of others.

I left in all the references to murder and manslaughter. And I stuck - - with defense counsel's agreement I struck the reference to atrocious or forcible or atrocious crimes.

I left in bottom of page two the reference defendant's not required to retreat and definitions of great bodily injury, et cetera.

(LD 6 at 680-81.)

The undersigned notes that in arguing his claim, petitioner points to witness testimony that the victim threatened to shoot party goers, as well as testimony of a witness who observed a gun in the victim's backpack "near or at the time of the shooting" (ECF No. 1 at 19), asserting the victim could carry out his threats, thus inferring the defense of others was necessary. However, what petitioner fails to address is the other significant evidence upon which the trial court relied in making its determination: the evidence that petitioner and the victim walked away from the

41

party and other partygoers to talk or fight "old school," and, therefore, no one else was around at the time of the actual confrontation, and that there was a lack of evidence that others at the party felt threatened. (See LD 4 189, 194, 216-18, 234-35, 252-53, 257-58, 260-61, 272, 274-76; LD 5 307, 445, 451, 493.)

Nevertheless, the state appellate court did not find error on the part of the trial court in refusing to give the requested instruction; rather, it is assumed error occurred and assessed whether the error was prejudicial and required reversal. (LD 12 at 30.) Ultimately it concluded that regardless of the standard applied when assessing the harm of an error, any error in this case was harmless beyond a reasonable doubt because the jury rejected the other defenses asserted: self-defense and imperfect self-defense. It recited evidence indicating that the victim sought to fight petitioner only and that the other party guests did not consider themselves to be at risk. (LD 12 at 31-32.) This determination was reasonable.

In light of the evidence and the instructions as a whole, the undersigned notes any error by the trial court did not render the trial "so fundamentally unfair as to violate due process" because it did not have a "substantial and injurious effect" on the jury's verdict. Brecht, 507 U.S. at 637; O'Neal v. McAninch, 513 U.S. at 437; Duckett v. Godinez, 67 F.3d at 746. The jury rejected self-defense and imperfect self-defense theories where there was arguably more evidence in support of those theories; it is not reasonably probable the jury would have found petitioner guilty of a lesser crime had the defense of others instruction been given. Byrd v. Lewis, 566 F.3d at 860.

Accordingly, the state court's determination is neither unreasonable nor is it based upon a contrary application of existing federal precedent. 28 U.S.C. § 2254(d)(1). As a result, petitioner is not entitled to relief and it is recommended the claim asserted in ground four be denied.

Ground Five: *CALCRIM 3472*

Petitioner complains the trial court committed error by instructing the jury with CALCRIM 3472. (ECF No. 1 at 20-22.) Respondent counters this is a state law claim and that, in any event, the state court's determination was not unreasonable. (ECF No. 15 at 63-71.)

As before, the last reasoned rejection of petitioner's claim is the decision of the California

42

Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court

addressed this claim as follows:

### CALCRIM No. 3472

The trial court instructed the jury with CALCRIM No. 3472 as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Defendant contends CALCRIM No. 3472 misled the jury by stating a defendant who provokes a non-deadly fistfight has no right of self-defense against subsequent lethal force. We are not persuaded.

### A. *Cognizability*

The Attorney General asserts this issue has not been preserved for appellate review for lack of objection by the defense to the giving of CALCRIM No. 3472. The record indicates defendant's trial attorney did not object to CALCRIM No. 3472 or request that it be modified. Nonetheless, we determine the issue is cognizable on appeal. "Where [a] defendant asserts that an instruction is incorrect in law an objection is not required. (*People v. Smithey* (1999) 20 Cal.4th 936, 976–977, fn. 7; § 1259 ['The appellate court may ... review any instruction given, ... even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby'].)" (*People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11.) Here, defendant argues CALCRIM No. 3472 misstates the law regarding self-defense. No objection was necessary to preserve this issue for our review.

### B. *Review*

It is well established that "[t]he trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*Ibid.*) We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### C. *Right of Self-defense by Initial Aggressor*

For more than a century, it has been the "the rule that, 'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. ... If the victim uses such force, the aggressor's right of self-defense arises. ...'(1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses § 75, p. 410), or its corollary, 'If, however, the

43

counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his [or her] adversary his [or her] willingness to decline the strife, if he [or she] cannot retreat with safety, then as the greater wrong of the deadly assault is upon his [or her] opponent, he [or she] would be justified in slaying, forthwith, in self-defense.' (*People v. Hecker* (1895) 109 Cal. 451, 463–464.)" (*People v. Quach* (2004) 116 Cal.App.4th 294, 301–302.)

Here, defendant contends he was entitled to engage in self-defense because "at least some jurors likely believed that [he] provoked a fistfight by leaving the party to accept Montejano's invitation to fight." However, defendant asserts, CALCRIM No. 3472 erroneously foreclosed any claim of self-defense. In so arguing, defendant relies on the majority decision in *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*). [Fn. omitted.]

Testimony at trial in *Ramirez* established two codefendant gang members instigated a fistfight with rival gang members. (233 Cal.App.4th at p. 944.) One of the codefendants testified that when he saw a rival gang member draw an object that appeared to be a gun, he pulled out his own gun and shot the rival gang member. (*Id*. at p. 945.) During closing arguments the prosecutor argued, based on the language of CALCRIM No. 3472, that even if the defendants sought only to engage in a fistfight, their intent to provoke any kind of fight forfeited any claim of self-defense. (*Id*. at pp. 943, 945–946.) The trial court in *Ramirez* instructed the jury with CALCRIM No. 3472. (*Ramirez*, at pp. 946, 948.) Convicted of first degree murder, the codefendants appealed and argued CALCRIM No. 3472 erroneously precluded the jury from finding they acted in justifiable self-defense. (*Id*. at p. 943.)

The majority in *Ramirez* reversed, explaining that "CALCRIM No. 3472 *under the facts before the jury* did not accurately state governing law." (233 Cal.App.4th at pp. 947, 953, italics added.) Compounding the error, "the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Id*. at p. 953.) Moreover, on motion of the prosecution, the trial court modified another instruction, CALCRIM No. 571, to prevent the jury from relying on imperfect self-defense. (*Id*. at p. 952.) The problematic modification of CALCRIM No. 571 "told the jury: 'The principle of imperfect self-defense *may not be invoked* by a defendant who, through his [or her] own wrongful conduct (e.g., the invitation of a physical assault or the commission of a felony) has created circumstances under which his [or her] adversary's attack or pursuit is legally justified." (*Ramirez*, at p. 952, italics added.)

We reject defendant's reliance on *Ramirez* because this case does not suffer the same errors. We begin by noting the *Ramirez* court acknowledged CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances." (*Ramirez, supra*, 233 Cal.App.4th at p. 947.) Moreover, as the dissent in *Ramirez* noted, "By its express language, CALCRIM No. 3472 does not apply to every person who initiates a fight and subsequently claims self-defense. Instead, it

applies to a subset of individuals who not only instigate a fight, but do so with the specific intent that they contrive the necessity for their acting thereafter in 'self-defense,' and thus justify their further violent actions." (*Id*. at p. 954 [Fybel, J., dissenting].) Unlike *Ramirez*, other pattern instructions in this case clearly informed the jury defendant could claim both perfect and imperfect self-defense.

Where the modified version of CALCRIM No. 571 in *Ramirez, supra*, 233 Cal.App.4th 940 removed self-defense from consideration in that case, here CALCRIM No. 571 informed the jury self-defense and imperfect self-defense were issues for the jury to decide. As given in this case, CALCRIM No. 571 stated in pertinent part:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense[.] [¶] *If you conclude the defendant acted in complete self-defense his action was lawful and you must find him not guilty of any crime*. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense if: [¶] 1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] and [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] but [¶] 3. At least one of those beliefs was unreasonable. [¶] ... [¶] *The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder*." (Italics added and brackets, capitalization, parenthesis, and slashes omitted.) Defendant's jury was also instructed with CALCRIM No. 505 that defined self-defense and stated in pertinent part that: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense." (Brackets, parenthesis, and slashes omitted.)

In short, CALCRIM No. 3472 in this case provided a correct expression of the law that a defendant may not contrive to initiate a fight in order to create a claim of self-defense. CALCRIM No. 3472 did not remove from the jury's consideration the possibility defendant acted in self-defense or imperfect self-defense. And CALCRIM Nos. 505 and 571 expressly defined self-defense and imperfect self-defense. These instructions explained defendant was not guilty of any offense if he acted in self-defense and he was only guilty of manslaughter if he acted in imperfect self-defense. Consistent with these instructions, the prosecutor in this case acknowledged the availability of self-defense and imperfect self-defense as defenses to the charges, but argued the evidence did not support a finding defendant acted in self-defense or imperfect self-defense. The prosecutor did not mention CALCRIM No. 3472 or assert defendant contrived a claim of self-defense. Consequently, defendant has not demonstrated the trial court erred by instructing the jury with CALCRIM No. 3472.

(People v. Ramirez, slip. op., at 35-40.)

*Applicable Legal Standards*

Claims of error in state jury instructions are generally matters of state law and thus do not usually invoke a constitutional question. See Gilmore v. Taylor, 508 U.S. 333, 343 (1993). And, the federal court is bound by a state appellate court's interpretation of California state law. See Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state law questions").

To merit federal habeas relief when an allegedly erroneous jury instruction is given, or an instruction is omitted, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 71-72; Henderson v. Kibbe, 431 U.S. at 155.

In a criminal trial, a jury instruction violates due process if it fails to give effect to the requirement that the State prove every element of the offense. Middleton v. McNeil, 541 U.S. 433, 437 (2004) (citing Sandstrom v. Montana, 442 U.S. 510, 520-21 (1979)); see also Keating v. Hood, 191 F.3d 1053, 1061 (9th Cir. 1999) (instruction that relieves state of burden of proving mens rea beyond reasonable doubt contradicts presumption of innocence and invades function of jury, thereby violating due process), cert. denied, 531 U.S. 824 (2000), abrogated on other grounds by Mancuso v. Olivarez, 292 F.3d 939, 944 n.1 (9th Cir. 2002) (citation omitted). Claims of instructional error must be evaluated in the context of the instructions as a whole, not in artificial isolation. Estelle, 502 U.S. at 72; United States v. Frady, 456 U.S. 152, 169 (1982). Moreover, as previously noted, a petitioner is not entitled to habeas relief unless an error had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 637-38; see also Clark v. Brown, 450 F.3d at 905 ("A habeas petitioner must show that the alleged instructional error 'had substantial and injurious effect or influence in determining the jury's verdict'").

////

////

46

1      *Analysis*

2          To reiterate, the trial court instructed the jury that "[a] person does not have the right to

3      self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use

4      force." (LD 6 at 799; LD 2 at 384 [CALCRIM 3472].)

5          While petitioner asserts here, as he did in the state courts, that his constitutional rights

6      were violated, the state court's holding was not unreasonable, nor was it contrary to federal

7      precedent.

8          The state court considered petitioner's claim, including his reliance on People v. Ramirez,

9      233 Cal. App. 4th 940 (2015), and concluded that CALCRIM 3472 "'states a correct rule of law'"

10     and was factually distinguishable from petitioner's case in light of the overall charge given to the

11     jury. This court is bound by the state court's finding that CALCRIM 3472 states an accurate

12     legal rule. See Waddington v. Sarausad, 555 U.S. at 192 n.5. Next, unlike the situation in

13     Ramirez, CALCRIM 571 was not improperly modified in this case. Further, that instruction was

14     accompanied by other jury instructions accurately defining self-defense and imperfect self-

15     defense. (LD 6 at 781-83, 788-89; LD 2 at 356-58, 369-70.) Also unlike Ramirez, in petitioner's

16     trial, the prosecutor did not argue petitioner's claim to self-defense was contrived; rather, he

17     argued the claim did not fit the facts. (LD 6 at 701-35, 756-64 [prosecutor's closing argument &

18     rebuttal].) Finally, here, the prosecution's burden of proof – beyond a reasonable doubt – was

19     clear from other instructions given to the jury. (See, e.g., LD 6 at 769-70, 779-80, 783-88; LD 2

20     at 331, 351, 362-65, 367-70; see also LD 2 at 379, 381, 383.) Estelle, 502 U.S. at 72; United

21     States v. Frady, 456 U.S. at 169.

22         For the reasons explained above, petitioner cannot show CALCRIM 3472 had a

23     "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507

24     U.S. at 637-38; see also Clark v. Brown, 450 F.3d at 905.

25         In light of the foregoing, the state court's determination that the trial court did not err by

26     instructing the jury with CALCRIM 3472 was reasonable, and was not contrary to Supreme Court

27     precedent. 28 U.S.C. § 2254(d)(1). Therefore, the undersigned recommends that petitioner's

28     ground five be denied.

47

Ground Six:  *Cumulative Error*

Petitioner's sixth claim is that the cumulative effect of the errors alleged in grounds two through five constitute a denial of due process.  (ECF No. 1 at 22-23.)  Respondent contends: (1) the Supreme Court has never held that federal habeas relief can be granted due to the accumulating prejudicial effect of two or more errors that, on their own, are not so prejudicial as to warrant federal habeas relief, (2) that even so, petitioner has failed to show multiple errors resulting in prejudice in violation of his due process rights, (3) that petitioner's claim is barred by Teague, (4) that petitioner has failed to establish multiple errors resulting in prejudice that violates his due process protections has occurred, and (5) that the state court's decision was not contrary to, or an unreasonable application of, United States Supreme Court precedent.  (ECF No. 15 at 71-75.)

### *Analysis*

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)).  "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  Parle, 505 F.3d at 927 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  See also Hein v. Sullivan, 601 F.3d 897, 916 (9th Cir. 2010) (same).

Initially, as it concerns respondent's claim that to grant petitioner relief on this claim would amount to a new rule of criminal procedure, the Ninth Circuit has explicitly rejected arguments that a claim of cumulative error is not clearly established or that it is Teague-barred.  See Parle, 505 F.3d at 928, n.8 ("The State's argument that Parle's cumulative error claim is not cognizable on habeas review because it asks the court to recognize a new constitutional rule, see Teague v. Lane, 489 U.S. 288 (1989), lacks merit.  As noted above, Chambers [v. Mississippi,

410 U.S. 284 (1973)] and its progeny clearly established the cumulative error doctrine decades ago"). In view of clear Ninth Circuit authority specifically refuting respondent's contention, the undersigned is compelled to conclude that petitioner's claim of cumulative error is not barred from habeas review under Teague.

Concerning the merits of petitioner's claim,[6] this court has addressed each of petitioner's claims, and in particular the claims alleged in grounds two through five, and has concluded that no error of constitutional magnitude occurred. More specifically, in ground two, the undersigned agreed with the state court that error occurred, yet also agreed the error was harmless. And in ground four, even assuming error occurred, that error too was harmless. As explained *ante*, the undersigned recommended that grounds two through five be denied.

This court also concludes that the alleged errors, even when considered together, did not render petitioner's defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." Chambers, 410 U.S. at 295; Parle, 505 F.3d at 917.

Accordingly, petitioner is not entitled to relief on his claim of cumulative error as to grounds two through five. Therefore, the undersigned recommends ground six of petitioner's habeas petition be denied.

Ground Seven: *Cruel and Unusual Punishment*

Finally, petitioner argues that the imposition of a twenty-five years-to-life sentence imposed following the jury's true finding that he used a firearm in the commission of the murder amounts to cruel and unusual punishment in violation of the Eighth Amendment. (ECF No. 1 at 23-26.) Respondent maintains that the state court's determination that the sentence is neither cruel nor unusual is reasonable and thus precludes relief. (ECF No. 15 at 75-80.)

Again, the last reasoned rejection of petitioner's first claim is the decision of the Third District Court of Appeal. The state court addressed this claim as follows:

> Defendant contends his sentence enhancement of 25 years to life in prison for violating section 12022.53, subdivision (d), constitutes cruel and unusual punishment. Here, the trial court sentenced defendant to serve 15 years to life in prison for second degree murder

---

[6] The Third District Court of Appeal also considered and rejected a similar claim. (LD 12 at 40.)

and a consecutive term of 25 years to life in prison for the section 12022.53, subdivision (d), firearm enhancement. We join with other California appellate courts on this issue in rejecting the contention. [Fn. omitted.]

Defendant challenges the facial validity of section 12022.53, subdivision (a), under the Eighth Amendment to the United States Constitution and under article I, section 17, of the California Constitution. In so arguing, he acknowledges similar challenges have been rejected in *People v. Hernandez* (2005) 134 Cal.App.4th 474; *People v. Gonzalez* (2001) 87 Cal.App.4th 1; and *People v. Martinez* (1999) 76 Cal.App.4th 489.

As the *Martinez* court explained, "Section 12022.53, also known as the '10–20–life' law, was enacted in 1997 to substantially increase the penalties for using a firearm in the commission of designated felonies. The Legislature found 'that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and deter violent crime.' (Stats. 1997, ch. 503, § 1.) ... [¶] The statute provides increasing prison terms (10 years, 20 years, and 25 years to life) for increasingly serious circumstances of firearm use. Under subdivision (b), if the defendant 'personally used a firearm' [citation], the mandatory additional consecutive punishment is 10 years. Under subdivision (c), if the defendant 'intentionally and personally discharged a firearm,' the mandatory additional consecutive punishment is 20 years. Under subdivision (d), ... if the defendant 'intentionally and personally discharged a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice,' the mandatory additional consecutive punishment is 25 years to life. The punishment is not subject to being stricken or reduced in the trial court's discretion." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 493.)

The *Martinez* court properly noted that "[t]he judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. (*Harmelin v. Michigan* [(1991)] 501 U.S. [957,] 998 (conc. op. of Kennedy, J.); *People v. Dillon* [(1983)] 34 Cal.3d [441,] 477.) Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. (*People v. Weddle* [(1991) ] 1 Cal.App.4th [1190,] 1196–1197; *People v. Mora* (1995) 39 Cal.App.4th 607, 615–616.) This is not such a case." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.)

"Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies [including murder]. The statute then sets forth three gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and

50

intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 495, fn. omitted.) We agree with *Martinez* that the Legislature's "careful gradation" of sentences to address the serious nature of violent crime committed by use of a firearm does not run afoul of the constitutional prohibition on arbitrary or cruel punishment. Accordingly, we reject defendant's facial challenge to the constitutional validity of section 12022.53, subdivision (d).

(People v. Ramirez, slip. op., at 32-34.)

*Applicable Legal Standards*

The Eighth Amendment, which forbids cruel and unusual punishments, "contains a 'narrow proportionality principle,'" that applies to noncapital sentences and "'does not require strict proportionality between crime and sentence' but rather forbids only extreme sentences that are 'grossly disproportionate' to the crime." Graham v. Florida, 560 U.S. 48, 59-60 (2010) (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 1000-01 (1991) (Kennedy, J., concurring) (some internal quotation marks omitted)); see also Lockyer v. Andrade, 538 U.S. at 72 (under "clearly established" Eighth Amendment jurisprudence, "[a] gross disproportionality principle is applicable to sentences for terms of years"). "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." Andrade, 538 U.S. at 77; see also Rummel v. Estelle, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare").

"The threshold determination in the eighth amendment proportionality analysis is whether [petitioner's] sentence was one of 'the rare case[s] in which a ... comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" United States v. Bland, 961 F.2d 123, 129 (9th Cir.1992) (quoting Harmelin, 501 U.S. at 1005 (Kennedy, J., concurring)); Norris v. Morgan, 622 F.3d 1276, 1290 (9th Cir. 2010). In addressing this issue, the Court compares the harshness of the penalty imposed upon petitioner with the gravity of his triggering offenses and criminal history. Ewing v. California, 538 U.S. 11, 28-29 (2003).

*Analysis*

Petitioner argues California Penal Code section 12022.53(d) "is constitutionally defective because it does not recognize significant gradations of culpability depending on the severity of

51

the current offense, fails to take mitigating factors into consideration, and arbitrarily imposes severe punishment in cases involving criminal use of a gun as compared to the use of other dangerous or deadly weapons." (ECF No. 1 at 24.) He maintains the statute is "unconstitutionally arbitrary and capricious on its face" as demonstrated by his cited example that had he been convicted of committing the same crime with the use of a knife rather than a firearm, petitioner would have been "facing a dangerous/deadly weapon enhancement term of one year rather than the 25-years-to-life" he is presently serving. (ECF No. 1 at 25.)

As an initial matter, petitioner's sentence enhancement of twenty-five-years-to-life is presumptively valid because it was mandated by California Penal Code § 12022.53(d) and (e)(1). See United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998) ("A punishment within legislatively mandated guidelines is presumptively valid"). Federal courts should be "reluctan[t] to review legislatively mandated terms of imprisonment." Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (quoting Hutto v. Davis, 454 U.S. 370, 374 (1982)). "Generally, as long as the sentence imposed on the defendant does not exceed statutory limits, we will not overturn it on eighth amendment grounds." United States v. Zavala-Serra, 853 F.2d 1512, 1518 (9th Cir. 1988). Here, petitioner's sentence did not exceed the statutory limit so as to overcome the presumption of validity.

Further, as the Ninth Circuit concluded in Plascencia v. Alameida, 467 F.3d 1190 (9th Cir. 2006), the undersigned concludes on the facts of this case, that a consecutive, twenty-five-years-to-life sentence imposed pursuant to California Penal Code section 12022.53(d) does not violate the Constitution's prohibition against cruel and unusual punishment. Plascencia, 467 F.3d at 1204 (citing Harmelin v. Michigan, 501 U.S. at 996-97). Petitioner's sentence is not grossly disproportionate to his crime of murder. Cf. Lockyer v. Andrade, 538 U.S. at 73-75 (rejecting Eighth Amendment challenge to 50-years-to-life sentence under California's Three Strikes Law for two counts of petty theft with a prior misdemeanor conviction, given the petitioner's extensive criminal history including three residential burglary convictions); Ewing v. California, 538 U.S. at 28-30 (same for 25-years-to-life sentence for third strike conviction for shoplifting, given petitioner's 16-year criminal history including numerous misdemeanor and felony convictions);

52

Hutto v. Davis, 454 U.S. at 374-75 (same for 40-year sentence for possession and distribution of nine ounces of marijuana); Harmelin v. Michigan, 501 U.S. at 1005 (same for mandatory life sentence for first offense of possession of 672 grams of cocaine); Solem v. Helm, 463 U.S. at 297-303 (finding life sentence without the possibility of parole for uttering a no account check for $100 for defendant who had three prior convictions for third-degree burglary, one prior conviction for obtaining money under false pretenses, and one prior conviction for driving while intoxicated was significantly disproportionate, violating the Eighth Amendment); Rummel v. Estelle, 445 U.S. at 285 (rejecting Eighth Amendment challenge to mandatory life sentence with possibility of parole for obtaining $120.75 under false pretenses, where defendant had prior convictions for fraudulent use of a credit card and passing a forged check); Weems v. United States, 217 U.S. 349, 367 (1910) (finding sentence of 15 years in chains and at hard labor plus permanent surveillance and civil disabilities for falsifying a public document violated the Eighth Amendment).

A purported failure to "recognize significant gradations of culpability" before imposition of a twenty-five year sentence for use of a firearm is not required by Supreme Court precedent. Nor has the Supreme Court held that a statute such as California's is unconstitutional because it does not treat the use of all weapons used to commit a crime causing great bodily injury or death the same. Lockyer v. Andrade, 538 U.S. at 72-73.

As the foregoing Supreme Court decisions make clear, the crime petitioner committed, personally and intentionally discharging a firearm causing death, and the twenty-five-years-to-life sentence petitioner received as a result, is not so disproportionate as to violate the Eighth Amendment. As respondent asserts, petitioner's case is neither exceedingly rare nor extreme resulting in a sentence grossly disproportionate to the crime. In sum, the state court's rejection of this claim was objectively reasonable under existing Supreme Court precedent. 28 U.S.C. § 2254(d). The undersigned recommends the claim be denied.

////

////

////

53

VI. Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 12, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Rami0619.157